# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RANDOLPH STEVEN ESQUIVEL,
Defendant and Appellant.

S262551

Second Appellate District, Division Five
B294024

Los Angeles County Superior Court
NA102362

June 17, 2021

Chief Justice Cantil-Sakauye authored the opinion of the
Court, in which Justices Corrigan, Liu, Cuéllar, Kruger,
Groban, and Jenkins concurred.

PEOPLE v. ESQUIVEL

S262551


Opinion of the Court by Cantil-Sakauye, C. J.


When new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date. (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) A case in which a defendant is placed on probation with imposition of sentence suspended is not yet final for this purpose if the defendant may still timely obtain direct review of an order revoking probation and imposing sentence. (*People v. McKenzie* (2020) 9 Cal.5th 40 (*McKenzie*).) We hold that a case in which a defendant is placed on probation with execution of an imposed state prison sentence suspended is not yet final for this purpose if the defendant may still timely obtain direct review of an order revoking probation and causing the state prison sentence to take effect.

## I. BACKGROUND

Defendant Randolph Steven Esquivel pleaded no contest to a felony and admitted two prior prison terms. In 2015, the trial court sentenced him to three years' imprisonment for the felony and one additional year for each of the two priors. The court then suspended execution of the state prison sentence and placed defendant on probation. Defendant did not challenge his sentence on appeal at that time. About three years later, in 2018, the court found defendant in violation of a condition of probation and ordered the sentence into effect.

Defendant appealed. During the pendency of his appeal, the Legislature amended the provision under which the trial court had imposed the two 1-year enhancements. Specifically, the Legislature enacted Senate Bill No. 136 (2019–2020 Reg. Sess.) (hereafter Senate Bill 136), which made the enhancement provision applicable only to prison terms imposed for certain sexually violent offenses. (See Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020, amending Pen. Code, § 667.5, subd. (b).) If the amended provision had been in effect at the time of defendant's sentencing, it would not have applied to his prior prison terms. The parties agreed that the amendment applies to all cases that were not final when the legislation took effect. The parties disagreed, however, about whether defendant's case was already final.

The Court of Appeal held that it was. The court reasoned that defendant could have appealed his sentence when that sentence was imposed, in 2015. The sentence became final, the court continued, when defendant failed to timely appeal from the order imposing sentence. (*People v. Esquivel* (Mar. 26, 2020, B294024) [nonpub. opn.].) We granted review.[1]

## II. THE *ESTRADA* PRESUMPTION

George Ramirez Estrada was convicted of a misdemeanor drug offense and committed to a rehabilitation center. (*Estrada, supra*, 63 Cal.2d at p. 742.) He escaped. (*Ibid.*) At that time, a person convicted of such an escape could not be paroled without

---

[1]     The parties continue to agree, and the Court of Appeal has held, that Senate Bill 136 applies retroactively to nonfinal judgments. (See, e.g., *People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342.) Our grant of review did not include that issue, and nothing in this opinion casts doubt on that conclusion.

first serving two years in prison. (*Id.* at pp. 742–744.) Before Estrada was convicted and sentenced, however, new legislation that afforded earlier parole eligibility took effect. (*Id.* at p. 744.) This court held that Estrada was entitled to the benefit of the new legislation. (*Ibid.*) "If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final," we concluded, then "it, and not the old statute in effect when the prohibited act was committed, applies." (*Ibid.*)

The issue, we reasoned, was one of legislative intent. (*Estrada, supra*, 63 Cal.2d at p. 744.) "Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional." (*Ibid.*) In the absence of such a declaration of intent, we identified "one consideration of paramount importance" (*ibid.*): "When the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Id.* at p. 745.) Under those theories, punishment is

appropriate to deter, confine, and rehabilitate; " '[t]here is no place in the scheme for punishment for its own sake.' " (*Ibid.*)[2]

*Estrada*'s presumption of retroactivity has been a fixture of our criminal law for more than 50 years. During this time, "the development of modern theories of penology has continued to unfold." (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1045, fn. 1.) About 10 years after we decided *Estrada*, our Legislature "declare[d] that the purpose of imprisonment for crime is punishment." (Stats. 1976, ch. 1139, § 273, p. 5140, adding Pen. Code, § 1170.) The Legislature did not directly address the *Estrada* presumption, however, and we adhered to that presumption in the years that followed. (See *People v. Nasalga* (1996) 12 Cal.4th 784, 792 (plur. opn.); see also *id.* at p. 799 (conc. opn. of Kennard, J.).) More recently, our Legislature conveyed that "the purpose of sentencing is public safety achieved through punishment, rehabilitation, and restorative justice" — echoing a premise on which *Estrada* was based. (Pen. Code, § 1170, subd. (a)(1), as amended by Stats. 2016, ch. 696, § 1.) And regardless of the reasons for imposing punishment, ameliorative legislation reflects a determination that a "former penalty was too severe and that lighter punishment is proper." (*Estrada, supra,* 63 Cal.2d at p. 745.)

*Estrada* thus continues to stand for the proposition that (i) in the absence of a contrary indication of legislative intent,

---

[2]    We also drew upon common law principles to contextualize two statutory provisions and explain why those provisions did not support a contrary inference regarding legislative intent. (See *Estrada, supra,* 63 Cal.2d at pp. 746–748 [discussing Pen. Code, § 3 and Gov. Code, § 9608].)

(ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date.

Our case law has explored each of those three issues. First, we have considered whether an enactment was intended to apply only prospectively. (See, e.g., *In re Kapperman* (1974) 11 Cal.3d 542, 546; *In re Pedro T.*, *supra*, 8 Cal.4th at pp. 1045–1047; *People v. Floyd* (2003) 31 Cal.4th 179, 185–186; *People v. Conley* (2016) 63 Cal.4th 646, 657–659 (*Conley*); *People v. Dehoyos* (2018) 4 Cal.5th 594, 603; *People v. Gentile* (2020) 10 Cal.5th 830, 851–859 (*Gentile*); cf. *People v. Viera* (2005) 35 Cal.4th 264, 305–306 [discussing legislation both enacted and repealed during pendency of a case].) An express indication of intent is sufficient but not necessary to overcome the *Estrada* presumption. (*Conley*, at p. 656.) For example, "when ameliorative legislation sets out a specific mechanism as the exclusive avenue for retroactive relief, we have held that such legislation does not apply retroactively to nonfinal judgments on direct appeal." (*Gentile*, at p. 852.)

Second, we have evaluated whether several kinds of legislation ameliorate punishment. Our precedent relevant to that issue focuses primarily on whether a change in law is ameliorative. (See, e.g., *People v. Francis* (1969) 71 Cal.2d 66, 76 [discretion to impose lesser punishment]; *In re Boyle* (1974) 11 Cal.3d 165, 168 [limiting class of persons who may be denied bail]; *People v. Rossi* (1976) 18 Cal.3d 295, 300–301 [eliminating punishment] (*Rossi*); *People v. Wright* (2006) 40 Cal.4th 81, 94 [making available a defense]; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303 [possibility of trial and sentencing as a juvenile rather than an adult]; *People v. Frahs* (2020) 9 Cal.5th 618, 631 (*Frahs*) [pretrial diversion with potential for more lenient treatment]; *People v. Stamps* (2020) 9 Cal.5th 685, 699

[discretion to strike an enhancement]; but see *In re Griffin* (1965) 63 Cal.2d 757, 760–761 [change that was detrimental to defense overall]; *People v. Brown* (2012) 54 Cal.4th 314, 325 [change to accrual of good behavior credits incentivized future conduct rather than altering the penalty for a crime, and thus did not ameliorate punishment in the relevant sense].) We have also considered whether the consequence ameliorated was punishment covered by the presumption. (See *People v. Durbin* (1966) 64 Cal.2d 474, 479 [civil penalties or forfeitures]; *People v. Foster* (2019) 7 Cal.5th 1202, 1210 ["it is not clear that [a particular kind of] commitment, which we have characterized as 'not penal or punitive' [citation], is a type of judgment covered by *Estrada*[]"]; cf. *Frazer v. State Bar* (1987) 43 Cal.3d 564, 569 [considering application of amended rule of professional conduct in state bar disciplinary proceeding].)

Third, and in dispute here, we have addressed when a case becomes "final" for purposes of the presumption. *Estrada* used varied terminology to describe this issue, speaking of the finality of "the judgment of conviction" (*Estrada, supra,* 63 Cal.2d at p. 744); of "all cases not reduced to final judgment" (*id.* at p. 746); and, when describing a related common law rule, of "all prosecutions not reduced to final judgment" (*id.* at p. 747). (See *McKenzie, supra,* 9 Cal.5th at p. 46.) Regardless of the terminology, it is well settled that a matter is not "final" for this purpose merely because the defendant has already been sentenced. A defendant who is convicted and sentenced to a term of imprisonment without probation, for example, is presumptively entitled to the benefit of ameliorative legislation that takes effect before direct review is complete. (See *McKenzie,* at p. 45; *In re Corcoran* (1966) 64 Cal.2d 447, 449; *In re Kirk* (1965) 63 Cal.2d 761, 763.) The question in this case

arises because ameliorative legislation took effect after the initial time for defendant to challenge his 2015 sentence had elapsed, but before the conclusion of his appeal from the 2018 decision ordering that sentence into effect.

## III. DISCUSSION

*Estrada* presumed that our Legislature intends for ameliorative enactments to apply as broadly as is constitutionally permissible. The significance of finality was that legislation "constitutionally could apply" to nonfinal judgments. (*Estrada, supra,* 63 Cal.2d at p. 745.) After *Estrada,* however, various provisions have ameliorated punishment in connection with judgments that were clearly final at the time the provisions were enacted, without apparent constitutional infirmity. (See *Gentile, supra,* 10 Cal.5th at p. 853 ["the Legislature crafted a specific mechanism for seeking retroactive relief, and that mechanism does not distinguish between persons whose sentences are final and those whose sentences are not"]; cf., e.g., *Conley, supra,* 63 Cal.4th at p. 657 [discussing provision enacted by the electorate that "draws no distinction between persons serving final sentences and those serving nonfinal sentences, entitling both categories of prisoners to petition courts for recall of sentence"].) And if the Legislature is not categorically prohibited from mitigating punishment connected to final judgments, this naturally raises questions about the precise reach of the presumption that "the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada,* at p. 745.)

We adhere to the *Estrada* doctrine's longstanding nonfinality requirement, on which our Legislature may have relied when declining to limit the retroactive application of its enactments. (Cf. *Frahs, supra,* 9 Cal.5th at p. 635 ["when the Legislature enacted [Penal Code] section 1001.36, it was aware that if it did not want the statute to apply retroactively *to nonfinal judgments,* it needed to clearly and directly indicate such intent" (italics added)].) But the role of finality in *Estrada*'s reasoning counsels against importing a rigid understanding of the term "final" into this context. (See *McKenzie, supra,* 9 Cal.5th at p. 48.) Instead, we must look deeper to discern the meaning and significance of *Estrada*'s finality limit.

Recently, in *McKenzie,* we held that "a convicted defendant who [was] placed on probation after imposition of sentence [was] suspended, and who [did] not timely appeal from the order granting probation, [could] take advantage of ameliorative statutory amendments that [took] effect during a later appeal from a judgment revoking probation and imposing sentence." (*McKenzie, supra,* 9 Cal.5th at p. 43.) We reasoned that the defendant's "prosecution had not been 'reduced to final judgment at the time'" the ameliorative legislation was enacted (*id.* at p. 45), as the "'"criminal proceeding . . . ha[d] not yet reached final disposition in the highest court authorized to review it"'" (*ibid.*).

We then turned to the People's position. They argued that "[t]he relevant cutoff point under *Estrada* for applying ameliorative amendments is the date the 'judgment of conviction becomes final,'" and that the defendant's underlying conviction became final when he did not appeal the order placing him on probation. (*McKenzie, supra,* 9 Cal.5th at p. 46.) We disagreed. Part of our reasoning was specific to the suspended-

imposition context; we observed that "the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous,' " such that the absence of a sentence in a suspended-imposition case also implies the absence of a final judgment. (*Ibid*.) But part of our reasoning was more general; we further observed that *Estrada* referred not only to the finality of the judgment of conviction, but also to the finality of the " 'case[]' " or " 'prosecution[].' " (*McKenzie*, at p. 46.) A decision issued after *Estrada* similarly spoke in terms of the criminal proceeding as a whole. (*McKenzie*, at p. 46*,* citing *Rossi*, *supra*, 18 Cal.3d at p. 304.) Accordingly, we concluded that the defendant in *McKenzie* was entitled to relief because "it [could not] be said that this criminal prosecution or proceeding concluded before the ameliorative legislation took effect." (*McKenzie*, at p. 46.)

So too here. This case was not final, for purposes of the *Estrada* presumption, because the "criminal prosecution or proceeding" brought against defendant was not complete when the ameliorative legislation at issue took effect. (*McKenzie*, *supra*, 9 Cal.5th at p. 46.) Defendant had not exhausted direct review of the order causing his carceral punishment to take effect. The time for him to seek that review had not expired. And he had not successfully completed probation. (Cf. *ibid.* [noting our rejection in *People v. Chavez* (2018) 4 Cal.5th 771 (*Chavez*) of an argument that " 'the criminal action terminates' when 'the court orders a grant of probation' "].)

To the extent they are discernable, the constitutional concerns underlying *Estrada*'s rationale comport with our focus on the end of the criminal prosecution or proceeding. *Estrada* reasoned that nonfinal judgments could be modified constitutionally; it did not explicitly say that final judgments could never be modified. (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

Presumably, *Estrada* understood finality to trigger at least a potential constitutional restraint (i) on the Legislature's power to intervene in judicial decisionmaking or (ii) on the judiciary's power to affect matters that were no longer pending. But any constraint on the Legislature's power to affect "final" criminal judgments would appear to arise from the conclusion of a criminal proceeding as a whole. (Cf. *Plaut v. Spendthrift Farm, Inc.* (1995) 514 U.S. 211, 227 [focusing on "the last word of the judicial department with regard to a particular case or controversy"].) Certainly, the mere fact that a court has already addressed an issue in a case poses no insuperable constitutional bar to legislative activity affecting resolution of that issue. (See *People v. Babylon* (1985) 39 Cal.3d 719, 727 & fn. 10; *People v. Charles* (1967) 66 Cal.2d 330, 335; cf. *Bank Markazi v. Peterson* (2016) ___ U.S. ___, ___ [136 S.Ct. 1310, 1325] ["Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases"].) Nor does there appear to be any constitutional obstacle to the judiciary's reduction of a sentence imposed in a criminal prosecution that remains pending before that branch. True, there are some constraints on a trial court's ordinary discretion to modify suspended execution sentences. (See *People v. Howard* (1997) 16 Cal.4th 1081.) But those constraints are statutory, and in any event, defendants entitled to the benefit of ameliorative legislation may be able to obtain relief by other procedural means. (*People v. Buycks* (2018) 5 Cal.5th 857, 895.)[3]

---

[3] Whether or not some condition of finality might bear on the manner in which the Legislature can ameliorate punishment, *Estrada* does not hold, and we do not imply, that

To be clear, we need not and do not draw any precise constitutional lines to resolve this case. The *Estrada* doctrine is one of presumed legislative intent, not of constitutional law. The point is that to the extent *Estrada*'s unarticulated constitutional concerns shed light on the meaning of "final" for purposes of the presumption of retroactivity, those concerns appear to point toward an inquiry focused on whether the criminal prosecution or proceeding as a whole is complete.

Viewed through that lens, much of the People's briefing is unpersuasive. Whether the imposition of defendant's suspended execution sentence gave rise to a final judgment for purposes of appealability says little about whether the criminal prosecution or proceeding had concluded — and, thus, says little about whether the matter is "final" for purposes of *Estrada*.

The People also briefly argue that "[t]reating an imposed but suspended sentence as the source of a final judgment for *Estrada* purposes is consistent with the goals of the different forms of probation." They contend that "by imposing and suspending a sentence, the trial court tells a defendant that violating probation will result in 'irreversible consequences.' Telling defendants that these 'irreversible consequences' can . . . be reversed if the Legislature passes a new law — allowing them to escape from a sentence that is supposed to be 'hanging over' their heads — would tend to undermine this message."

This is no doubt true, to a point. The possibility that a punishment will be ameliorated may reduce the deterrent effect of that punishment. But this possibility already exists in the

---

the Legislature lacks constitutional authority to mitigate punishment connected to final criminal judgments. (See, e.g., *Gentile, supra,* 10 Cal.5th at p. 853.)

suspended execution context — threats of irreversible consequences notwithstanding. A case in which a defendant is convicted and placed on probation with execution of sentence suspended is not final while direct review of the order imposing sentence remains ongoing. (See *McKenzie, supra*, 9 Cal.5th at p. 46.) That process of direct review can be time consuming, including, for example, an appeal to the Court of Appeal; a petition for review directed to this court; and a petition for writ of certiorari directed to the United States Supreme Court. Through all these steps, a suspended execution sentence is not final, and the *Estrada* presumption remains available. Through all these steps, the "irreversible consequences" threatened at sentencing remain reversible by legislative enactment. The People's argument fails to explain why the Legislature would wish to ameliorate consequences during an appeal from an order imposing a suspended execution sentence, but not during an appeal from an order causing that sentence to take effect. We are not persuaded that any marginal difference in deterrence warrants denial of relief to those in defendant's position. (Cf. *McKenzie*, at p. 49 [argument regarding deterrence "did not persuade us in *Estrada* not to apply ameliorative revisions to defendants who have already committed criminal acts"].)

Finally, the People assert that "[r]eopening" suspended execution "case[s]" would deprive victims of a "certain degree of closure." But when an appeal from an order causing punishment to take effect is ongoing, there is no closed case to reopen; the criminal proceeding remains pending, and closure has yet to be obtained. Indeed, at the time when the People would have us deem suspended execution cases final (after direct review of the order imposing sentence is complete), it may be unclear whether the court will revoke probation and require

12

the defendant to suffer the punishment imposed. Even the terms of probation itself remain subject to modification. (*Chavez, supra,* 4 Cal.5th at p. 782.) So whatever degree of closure attends imposition of the sentence is not much closure at all; the defendant's ultimate fate " 'depends on the outcome of the probationary proceeding.' " (*Id.* at p. 781.)

At bottom, this is a case about presumed legislative intent. We see no persuasive reason to presume that the Legislature would wish to extend the benefit of ameliorative legislation to suspended-imposition defendants whose probation is revoked (per *McKenzie*), but not to suspended-execution defendants whose probation is revoked. Accordingly, we conclude that legislation ameliorating punishment presumptively applies to suspended execution cases pending on appeal from an order causing a previously imposed sentence to take effect.

## IV. DISPOSITION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Esquivel

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 3/26/2020 − 2d
Dist., Div. 5
**Rehearing Granted**

_____

**Opinion No.** S262551
**Date Filed:** June 17, 2021

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Jesus I. Rodriguez

_____

**Counsel:**

Mark R. Feeser, under appointment by the Supreme Court, and Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen, David W. Williams, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark R. Feeser
Attorney at Law
3940-7174 Broad Street
San Luis Obispo, CA 93401
(805) 542-0189

David W. Williams
Deputy Attorney General
300 South Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6182